**Opinion issued March 4, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00002-CV

———————————

## IN THE INTEREST OF A.C., K.L.C. III, AND L.C.

———

**On Appeal from the 306th District Court
Galveston County, Texas
Trial Court Case No. 18CP0096**

———

## MEMORANDUM OPINION

Appellant, K.L.C. II ("Father"), appeals the Order of Termination, terminating his parental rights to his children, A.C., K.L.C. III, and L.C. In four issues on appeal, Father argues that (1) the evidence was legally and factually insufficient that he engaged in one or more acts to support termination of his parental rights; (2) the evidence was legally and factually insufficient that

termination was in the best interest of the children; (3) the trial court abused its discretion when it appointed a non-parent as conservator of the children; and (4) he was denied the effective assistance of counsel before, during, and after trial, which caused harm and the rendition of an improper judgment.

We affirm.

## Background

T.C. ("Mother") and Father have three children, A.C., K.L.C. III, and L.C., who are the subject of this suit. An investigation of Mother began in April 2018 after appellee, the Department of Family and Protective Services (the "Department" or "DFPS"), received an allegation of neglectful supervision of the children by Mother's boyfriend, a drug dealer who had recently broken into Mother's home. In May 2018, after Mother and her children tested positive for drugs, the children were removed from the home and placed with foster parents, Thomas and Twila Richey.[1] On June 18, 2019, the Department sought termination of Mother's and Father's parental rights. As relevant here, the Department sought termination of Father's parental rights pursuant to Texas Family Code section 161.001(b)(1)(D), (E), (K), (N), (O), and (P).[2]

---

[1] On November 1, 2019, the foster parents intervened in the suit.

[2] *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (K), (N), (O), (P).

2

The parties proceeded to trial on December 16, 2019, despite Father not participating in person or by telephone.[3] The trial court heard the following evidence and testimony:

*Andrew Mennen*

In April 2018, Andrew Mennen, a DFPS investigator, said he became involved in the case because Mother's boyfriend, Edwin, broke into Mother's residence. Mennen met with A.C. at her school and learned that Edwin had threatened to punch her and her brothers, she was afraid of him, and he spanked her brothers hard. Following a drug test, Mother tested positive for methamphetamines and amphetamines, and upon the Department's request, Mother placed the children with Twila Richey. Mennen spoke with Father, who was currently living in Pennsylvania, and Father said he wanted his children to move to Pennsylvania. At that time, Father had two Texas warrants for his arrest for terroristic threats against Mother and he was on probation for DWI in Pennsylvania. Mennen testified that Father was upset that all of the kids tested positive for drugs. A.C. and L.C. tested positive for meth and K.L.C. III tested positive for meth, amphetamines, and cocaine. When asked if Father indicated any awareness of Mother's drug use, Mennen answered, "Well, he suspected drug use."

---

[3] Before trial, Mother filed an unrevoked or irrevocable affidavit of relinquishment of parental rights and is not a party to this appeal.

3

Mennen clarified that when Father stated that he suspected drug use, he had been living in Pennsylvania for approximately a year.

Mennen also testified that Mother expressed concern about the children's safety in Father's care. When asked about Mother's concerns, Mennen testified that "[s]he didn't think he would take care of the kids," Father "had an alcohol problem," he "wouldn't stop drinking," she "described him as violent," and he "beats [the children's] asses raw." He further testified that "I want to say there were two incidents where he threatened to kill her prior to the investigation and one incident where she told me he threatened to kill her during the investigation. She told me that he had raped her in the past and she believed that he was on probation at that time for DUI."

After Father expressed that he wanted to pick up the children, Mennen responded that because of the open warrants, Father would be arrested if he came to Texas and that Mennen was "personally worried about the kids in his care, just given all the facts."

Mennen also testified to an incident when Father and Mother were driving next to each other around the time that Father was leaving Texas for Pennsylvania and Father "made a gesture of a gun to a head and he was like cocking the trigger with his thumb. [Mother] called him and asked if he was serious. He said he was,

4

that he was going to kill her and he had a plan to do it." Mennen testified that he thought the children were in Mother's car when this incident occurred.

*Eric Kemmerer*

Eric Kemmerer, a conservatorship caseworker assigned to the children around September 2018, testified that he did not make contact with Father because Father's attorney instructed him not to have contact with Father. Kemmerer further testified that the Department filed a service plan for Father, Father did not complete the plan, Father did not provide him with any proof of completing any services, and Father did not provide a release to allow Kemmerer to verify completion of any services.

Kemmerer agreed that the children were placed with Twila Richey and her husband during the investigation, he has no concerns with the placement, the children are a part of their new family, and they are thriving in their current placement. While in the care of the Richeys, the children have been healthier and happier, and K.L.C. III and L.C.'s speech problems have improved. He also testified that for the last 18 months while the children were with their foster parents, Father had not seen them in person or made attempts to see them. Regarding phone calls, Kemmerer knew that Father had phoned the children three times in the past 18 months. Kemmerer testified that the Department wants the court to terminate Father's parental rights and that it would be in the children's

5

best interest because "[Father] is violent, and I don't think he needs to be around these children." Kemmerer stated that if the court terminates parental rights, the Department wants the Richeys to adopt the children, which would also be in the children's best interest.

On cross-examination, Kemmerer testified that he never told Father that he was not allowed to see the children and that he would have allowed Father to visit the children had he chosen or wanted to do so. When asked if Father made any attempts to see his children, Kemmerer answered, "No." Kemmerer also testified that Father was not paying child support toward the children. Kemmerer recalled that Father never asked who he could see outside Texas to complete his services, and Father's attorney likewise did not request who Father could see in Pennsylvania. Kemmerer agreed that Father's completion of a DWI probation in Pennsylvania had nothing to do with his current service plan. After he was asked again about Father's family service plan, Kemmerer agreed that Father had one but that he did not do everything on the plan. When asked specifically what Father did not do on the service plan, Kemmerer responded, "Everything."

*Leanna Amerson*

Leanna Amerson, an advocate from CASA, testified that the children have been living with foster parents since May 2018. When the children were removed, they were "quiet, to themselves, almost standoff-ish" and they needed dental work

such as cavities filled. When asked how the children are now, Amerson answered, "they're funny, talkative" and "I think they have changed, incredibly, especially with just their overall demeanor is improved." Amerson agreed that the children have significantly improved since the children were placed with the foster parents. Amerson testified that although both of the boys had speech delays, such as not talking at the time of removal, both boys now talk. Amerson said the foster parents have a safe and stable home and believes that it is in the children's best interest to stay in their current placement because "it's stable and because it is a nurturing environment where they're provided for and cared for and it's a consistent place for them."

On cross-examination, Amerson testified that she did not believe Father made arrangements to have any visits with the children. She further testified that A.C. was not familiar with her extended family because she was not sure which grandparents were which. In discussing her concern for reuniting the children with Father, Amerson explained, "the concern about [Father] is just his lack of cooperation with the family service plan, agitation that I pick up in my conversations with him, the history of alcohol, the abuse, the violent history, and just the fact that he left and started a new family."

Amerson admitted that she had previously recommended that relative adoption was preferred, but she had changed her mind at trial because the Richeys

7

intervened in the suit. Amerson had never noticed any physical abuse from Father, but acknowledged that Father had been in Pennsylvania since April and she appeared in the case in August.

*Mother*

Mother testified that when she was 17, she started dating Father, who was 24, and they married in 2010. She testified that domestic violence occurred five years into their marriage, and she recalled an incident in which Father punched her and knocked her out after they had an argument. She described the violence as every other week in the beginning and then towards the end it was daily. She stated that her children were always sleeping or were not home when the violence occurred.

Mother recalled that after they moved to Texas, they initially stayed with an uncle and aunt. During one weekend on the drive back to the relative's house, A.C. made an outcry of being molested by the uncle. After that incident, Mother and Father moved into their own home and Mother realized that if her daughter could stand up and say what is wrong, she should be able to stand up to Father. Mother then got a job, a vehicle, and a home, and she left Father in the beginning of the summer of 2017. Father moved back to Pennsylvania during the same summer.

Mother testified that Father threatened her with assaults during the marriage, and he made death threats after he moved to Pennsylvania. Mother testified that after Father left, he would say "if he can't have me, nobody can. And he would make sure of it." Mother agreed that she signed an affidavit of voluntary relinquishment, that she has an agreement with Twila Richey of continued contact, and that she is in no place to take care of her children right now. Mother believed the foster parents were the best place for her children.

When asked if Father had ever been physically violent with the children, Mother answered, "He was very hard on them, as far as, like, spankings and punishment, very hard on them." When asked if she thought Father was excessive with the children, Mother testified, "I think he was a little over the line sometimes. It caused a lot of our fights because I would tell him, 'You don't need to do this. You need to stop.' And he would just really beat their ass." Mother testified that she would be terrified if Father had parental rights to the kids. She testified that having Father's parental rights terminated and having the Richeys adopt the children would be in the children's best interest.

On cross-examination, Mother testified that she did not tell Father that she was using drugs and that because they were no longer together, it was none of his concern. She agreed that Father left marks and bruises on her, but she hid the bruises and marks from her kids.

*Officer Malmstrom*

Officer Malmstrom, formerly employed with the Texas City Police Department, testified that he issued a warrant for Father's terroristic threat against Mother around November 2017, based on a phone recording provided by Mother, in which Father stated that he was going to "beat her up and I believe he was going to shoot her, if I remember" and "he said he was going to assault her and kill her, shoot her." At that time of the threats, Father was living in Pennsylvania.

*Twila Richey*

Twila Richey testified that the children had been in her care for about 18 months. When they first came into her care, she recalled that "the boys couldn't speak," they were "standoff-ish and real quiet, hiding all the time," and "they were pretty much just scared." Since coming into her care, the children are "happy" and "[t]hey've grown a lot." She recalled that the boys had speech delays, which had improved. She agreed that the children's maternal grandparents have contacted her and that she intends to continue that communication. She testified that Father had called a few times on birthdays and would tell the children he loved them, but the last time he called, K.L.C. III hung up on him. Later in her testimony, Richey testified that although Father had her telephone number for a year, Father had called "maybe four or five" times. Based on what she had seen and heard, she expressed concern about the children being with Father.

Richey hopes to adopt all of the children.  When asked what she and her husband have planned for the children, Richey said "[g]ood education; well taken care of; trips; just basically fun; and, of course, education.  Got to have that education."  Richey also stated that one of her grandchildren is best friends with A.C., K.L.C. III, and L.C. and "[the grandchildren] come and stay the weekend and hang out."  She also stated that the children love her husband, that L.C. follows him around the yard, and that when her husband comes home, they all call him PaPa.  Richey testified that as long as Mother continues to do well, she will have continued contact with the children.  She agreed that Father does not check in very often.  Regarding financial assistance, Richey said she received $20 from Mother once but that recently she has not gotten anything from either parent.

Richey also recalled that she heard Father state, "Well, I'm not coming to steal my kids."  A month later, she heard from Mother who said that Father was making threats to her that he was going to move down here and steal the kids.  Richey identified a text message she received from Father, which included a picture of his new daughter and a message that he wanted his kids to meet their sister.

*April Ross*

Father's mother, April Ross, testified that Father currently lives in a trailer park in Dover, Pennsylvania and that Father has four children—the three that are

the subject of this suit and a fourth child in Pennsylvania. Ross testified that Father moved back to Pennsylvania in April 2018 and works full time in plumbing and heating. Ross said she did not know that Mother and Father were violent toward each other.

On cross-examination, Ross stated that Father's children were nine, five, and four-years old. Ross agreed that Father was not paying child support and that Father had received driving-under-the-influence offenses in 2008 and 2018. Ross agreed that Father arrived to live with her in Pennsylvania in April 2018 and that he arrived without his children. When asked about a 2006 arrest for public lewdness stemming from having a woman give Father a hand job in a restaurant, Ross agreed that she heard about the incident. Ross had also heard Father threaten Mother with punching her in the face. After Ross said she had not heard Father threaten to kill Mother, the Department played exhibit 12, a phone call recording of Father threatening to kill Mother. Ross admitted that she understood why the Department would have concerns with returning the children to Father. She admitted that Father likes to drink but that he did not use drugs. She stated that Father was not at trial because he had work and had warrants for his arrest, but he knew about the trial. She agreed that Father had made no attempts to visit his children in Texas.

At the close of trial, the trial court stated it was terminating Father's parental rights pursuant to subsection 161.001(b)(1)(D) and (O) and that termination was in the children's best interests. On December 16, 2019, the trial court entered a written order that terminated Father's parental rights pursuant to subsection 161.001(b)(1)(D) (endangering physical or emotional well-being of child), (N) (constructive abandonment), (O) (failure to comply with court order), and (P) (controlled substance).

Father filed a timely notice of appeal.

## Sufficiency of the Evidence

In his second issue on appeal, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that he committed one of the predicate acts under subsection 161.001(b)(1)(D), (N), (O), and (P).

## A. Standard of Review and Applicable Law

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly

scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under Texas Family Code section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362.

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we examine all the evidence in the light most favorable to the finding, assuming the "factfinder resolved disputed facts in

favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266. We must also disregard all evidence that the factfinder could have reasonably disbelieved or found to be incredible. *Id.*

When conducting a factual sufficiency review, we consider and weigh all the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

Subsection 161.001(b)(1)(D) requires the trial court to find by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his or her home is part of the "conditions or surroundings" of the child's home under subsection (D). *In re B.R.*, No. 01-13-00023-CV, 2013 WL 3243391, at *5 (Tex.

15

App.—Houston [1st Dist.] June 25, 2013, no pet.) (mem. op.). Thus, even though subsection (D) focuses on the child's living environment, "parental conduct may produce an endangering environment." *Id*.

As used in section 161.001, "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical well-being. *Id*.; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *See In re M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Boyd*, 727 S.W.2d at 534; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.— Houston [1st Dist.] 2009, pet. denied). Danger to a child's well-being may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

16

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Violence does not have to be directed toward the child or result in a final conviction—"Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77. Evidence that a person has engaged in abusive and violent conduct in the past permits an inference that the person will continue to engage in violent behavior in the future. *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Termination is permissible under subsection (D) if the Department proves that the parent's conduct caused a child to be placed or remain in an endangering environment, and, under subsection (D), termination may be based upon only a single act or omission. *Id.* at 764. A

17

factfinder may also infer that a parent's lack of contact with the child and absence from the child's life endangered the child's emotional well-being. *Id.* at 765 (citing *In re R.A.G.*, 545 S.W.3d 645, 652 (Tex. App.—El Paso 2017, no pet.)).

**B.     Analysis**

Father argues that the Department did not present any evidence that he "knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children" or that he "knew the children's environment created a potential for danger and no evidence that Appellant was aware of the danger but consciously disregarded it." Appellant maintains that he had moved to Pennsylvania in 2017 while his children remained in Texas and that the cause of the children's removal in 2018 had nothing to do with him. Although Mennen testified that Father suspected Mother's drug use, Father lived in Pennsylvania and had no personal knowledge or any evidence, "just mere suspicion."

The Department responds that substantial evidence exists in the record to support the subsection (D) predicate ground. We agree with the Department.

The evidence shows that Mother and her three children all tested positive for drugs. When asked if he was aware of drug use, Father admitted to Mennen that he had his suspicions about Mother's drug use. The evidence further shows substantial violence by Father toward Mother, both before and during the

18

Department's investigation. Mother testified that domestic violence occurred five years into their marriage, after A.C. and K.LC. III were born, and she recalled an incident in which Father punched her and knocked her out after they had an argument. She described the violence as occurring every other week in the beginning and then daily, toward the end of the marriage.

Mother testified that Father threatened her with assaults during the marriage and that death threats occurred even after he moved to Pennsylvania. Mother testified that after Father left, he would say "if he can't have me, nobody can. And he would make sure of it."

When asked if Father had ever been physically violent with the children, Mother answered, "He was very hard on them, as far as, like, spankings and punishment, very hard on them." When asked if she thought Father was excessive with the children, Mother testified, "I think he was a little over the line sometimes. It caused a lot of our fights because I would tell him, 'You don't need to do this. You need to stop.' And he would just really beat their ass."

When asked about Mother's concerns about Father, Mennen testified that "[s]he didn't think he would take care of the kids," Father "had an alcohol problem," he "wouldn't stop drinking," she "described him as violent" and he "beats their asses raw." He further testified that "I want to say there were two incidents where he threatened to kill her prior to the investigation and one incident

19

where she told me he threatened to kill her during the investigation. She told me that he had raped her in the past and she believed that he was on probation at that time for DUI."

Mennen also testified to an incident when Father and Mother were driving next to each other and Father "made a gesture of a gun to a head and he was like cocking the trigger with his thumb. [Mother] called him and asked if he was serious. He said he was, that he was going to kill her and he had a plan to do it." Mennen testified that he thought the children were in Mother's car when this incident occurred.

Officer Malmstrom testified that he made a report of Father's terroristic threat against Mother around November 2017, based on a phone recording provided by Mother, in which Father stated that he was going to "beat her up and I believe he was going to shoot her, if I remember" and "he said he was going to assault her and kill her, shoot her." Malmstrom testified that based on this incident, he issued a warrant for terroristic threat.

The Department played the phone recording at trial, and Officer Malmstrom's police report was admitted, which included Officer Malmstrom's statement:

> When [Father] called he asked [Mother] who she was texting. When [Mother] wouldn't tell him who she was texting, [Father] then stated, 'when I see you, there ain't no one in hell going to stop me from beating the shit out of you, [Mother].'

[Mother] asked him 'so you're going to beat the shit out of me because you want to know who I was texting?'

[Father] then stated 'I'm going to beat the living piss out of you. I'm going to beat you so hard that your fucking mom won't even recognize you.'

[Mother] asked 'so you're going to beat me up instead of kill me this time?' 'That's one step in a better direction I guess.'

[Father] then stated 'no [I'm] going to end up killing you, [I'm] going to pull my gun out and shoot you square in the fucking face.'

The police report also indicates that on July 14, 2017, a warrant was issued for Father for terroristic threat of a family/household member.

April Ross, Father's Mother, agreed that Father was not paying child support, arrived in Pennsylvania without his children, and that Father had threatened to kill Mother. Ross confirmed that Father had received DUI offenses in 2008 and 2018 and was arrested for public lewdness from having a woman give Father a hand job in a restaurant. Ross admitted that she understood why DFPS would have concerns with returning the children to Father and she agreed that Father made no attempts to come to Texas to see his children.

When asked if Father had made any threats to take the children during the course of the case, Richey recalled Father's comment, "Well, I'm not coming to steal my kids." Richey then heard a month later from Mother than Father was making threats to her that he was going to move down here and steal the kids.

21

The foregoing evidence establishes that Father had been violent toward Mother both before and after the Department's investigation, had threatened her with violence and death on multiple occasions leading to multiple warrants for his arrest, suspected Mother's drug use, had been arrested for public lewdness, left his children in Texas and moved to Pennsylvania, had not visited his children since he left, and had threatened to steal his children during the course of the case. Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children in violation of subsection 161.001(b)(1)(D). *See Jordan*, 325 S.W.3d at 724 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (holding that abusive or violent conduct by parent supports conclusion that child's surroundings endanger his physical or emotional well-being pursuant to subsection 161.001(b)(1)(D)); *In re R.A.G.*, 545 S.W.3d at 652 (stating that factfinder can infer from parent's lack of contact with child and parent's absence from child's life that such behavior endangered child's emotional well-being); *see also In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (stating that endangering conduct need not be directed toward

child). Moreover, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children in violation of subsection 161.001(b)(1)(D).

Because we conclude that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(D), we do not address Father's arguments that the evidence is legally and factually insufficient to support the trial court's findings under subsections (N), (O), and (P). *See In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (declining to address subsection (D) after finding legally and factually sufficient evidence of subsection (E)).

We overrule Father's second issue.

**Best Interest**

In his third issue, Father argues that legally and factually insufficient evidence supports a finding that termination of his parental rights was in the best interest of his children.

**A.    Applicable Law**

There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re*

*D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, however, and evidence is not required on all the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or

others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re*

*O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (citing *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet. denied)).

**B.    Analysis**

Regarding the children's desires, Mennen's affidavit attached to the petition to terminate parental rights stated that when Father was leaving for Pennsylvania in 2017, A.C. wanted him to stay, but Father told her no. Richey also testified that in Father's last phone call, K.L.C. III hung up on Father. No other evidence was presented on the children's current desires. The evidence further showed that Father had not seen his children since he moved to Pennsylvania and that he had very little communications with them. Although some testimony indicated that he did not visit his children because of his outstanding warrants, no evidence was presented as to why he did not have more communication with them. *See K.M. v. Tex. Dep't of Family & Protective Servs.*, 388 S.W.3d 396, 405 (Tex. App.—El Paso 2012, no pet.) (discussing parents' failure to visit child as factor supporting finding that termination was in child's best interest). This factor does not weigh in favor of or against terminating parental rights.

26

Regarding the children's emotional and physical needs now and in the future, and the possible emotional and physical danger to them now and in the future, the trial court heard evidence of Father's repeated domestic violence directed toward Mother. *See generally In re O.N.H.*, 401 S.W.3d at 684 (stating that past conduct is probative of future conduct when evaluating child's best interest). The trial court could have concluded that Father's pattern of repeated domestic violence showed that he "was not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest." *See In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.); TEX. FAM. CODE § 263.307(b). The evidence also showed that Father repeatedly threatened to harm or kill Mother, which resulted in warrants for terroristic threats. *See In re J.I.T.P.*, 99 S.W.3d at 846 (stating domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest); *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *19 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (noting that history of domestic violence supports finding that termination was in child's best interest); TEX. FAM. CODE § 263.307(b)(7) (considering whether parent has history of violent or abusive conduct as factor in best-interest analysis). The trial court was entitled to find that this factor weighed in favor of terminating parental rights.

Regarding parental abilities of the parent seeking custody, the evidence showed that Father failed to comply with nearly every provision of his service plan.[4]  *See In re J.-M.A.Y.*, Nos. 01-15-00469-CV & 01-15-00589-CV, 2015 WL 6755595, at *7 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, pet. denied) (mem. op.) ("[A] factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of [his] child[ ] that [ ]he does not have the ability to motivate [him]self to seek out available resources needed now or in the future."); *In re T.L.S. and E.A.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *7 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (considering whether parent completed all services under FSP in determining best interest).

Mother's testimony indicated that Father's behavior with the children led to their disagreements and that sometimes he crossed a line.  Mennen recalled Mother saying that Father "beat their asses raw."  The evidence also showed that Father moved to Pennsylvania despite his daughter's pleas for him to stay, he had not returned to see his children, and he had very little communication with them.  *See K.M.*, 388 S.W.3d at 405 (discussing parents' failure to visit child as factor supporting finding that termination was in child's best interest).  In contrast to this

---

[4]    In its February 25, 2019 report, CASA stated that it had received a certificate of completion of a substance abuse treatment program.

evidence, witnesses testified that the children were happy, healthy, and thriving in their foster home, and the foster family planned to adopt them. The trial court was entitled to find that this factor weighed in favor of terminating parental rights.

Regarding the plans for the children, Twila Richey testified that she and her husband had been caring for the children for the prior 18 months, the boys' speech delays had improved, and she hoped to adopt all of the children. Her plans for the children included "[g]ood education; well taken care of; trips; just basically fun; and, of course, education. Got to have that education." Twila also testified that as long as Mother continues to do well, she will have continued contact with the children. Other than testimony that Father has a job and lives in a trailer park, no evidence showed Father's plans for the children. Because Father presented no evidence of future plans for the children and Richey expressed plans to adopt the children and give them a good education, the trial court was entitled to find that this factor weighed in favor of terminating parental rights.

Regarding acts or omissions of the parent, substantial evidence showed that Father committed domestic violence against Mother throughout the marriage. The evidence also showed that Father had two DUI complaints, a prior arrest for public lewdness, and had two open warrants for terroristic threats against Mother in Texas. The evidence further showed that Father had very little communication with his children since moving to Pennsylvania and had not visited his children

since he left Texas. The trial court was entitled to find that this factor weighed in favor of terminating parental rights.

Regarding any excuses for his acts or omissions, Father did not appear at trial or participate by any other means. The record is therefore silent as to any excuse for his domestic violence, threats, public lewdness arrest, and DUI complaints. Regarding his sporadic communication with his children and his failure to visit them, the record reflects that Father was told that if he came to Texas, he would be arrested for his outstanding warrants. Although Father may have had some plausible reason to avoid Texas, the overwhelming weight of the evidence shows that the trial court was entitled to find that this factor weighed in favor of terminating parental rights.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights is in the children's best interest. *See In re J.I.T.P.*, 99 S.W.3d at 846 (stating domestic violence supports finding that termination is in child's best interest even when child is not victim of violence); *In re J.O.A.*, 283 S.W.3d at 344 (citing *In re J.F.C.*, 96 S.W.3d at 266); *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that placement in safe, stable foster home where child was doing well was relevant to child's emotional and physical needs and stability of home or proposed

placement and therefore supported trial court's best-interest finding); *Rogers v. Dep't of Family & Protective. Servs.*, 175 S.W.3d 370, 378 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (considering successful foster placement and possibility of adoption by foster parents supported determination that termination of parental rights was in children's best interest). In view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights is in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266). Accordingly, we hold that legally and factually sufficient evidence supports the trial court's best interest finding.

We overrule Father's third issue.

**Appointment of Department as Sole Managing Conservator**

In his fourth issue, Father argues that the trial court abused its discretion in appointing a non-parent, the Department, as sole conservator of the children.

When the parents' rights are terminated, the trial court must appoint "a suitable, competent adult, DFPS, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re M.M.M.*, No. 01-16-00998-CV, 2017 WL 2645435, at *17 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.). We review conservatorship determinations for an abuse of discretion and will reverse one only if the trial court's decision is arbitrary

31

and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *see also A.C.*, 394 S.W.3d at 644.

An order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to the child. TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to a termination order, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Because we have overruled Father's challenges to the trial court's order terminating his parental rights, the order has divested Father of his legal rights and duties related to the children. *See* TEX. FAM. CODE § 161.206(b); *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at \*5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). As a result, Father does not have standing to challenge the portion of the order appointing the Department as permanent managing conservator of the children because any alleged error could not injuriously affect his rights. *D.K.W.*, 2017 WL 6520439, at \*5.

We overrule Father's fourth issue.

### Ineffective Assistance of Counsel

In his first issue, Father argues that he received ineffective assistance of counsel before, during, and after trial.

## A. Applicable Law and Standard of Review

Parents who cannot afford to retain counsel in Texas parental-termination cases enjoy a right to appointed, effective counsel. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). We apply the established *Strickland* test in parental-termination proceedings. *Id.* at 545 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). *Strickland* imposes a two-pronged standard to establish an ineffective-assistance claim. First, the parent must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* Second, the parent must show that the deficient performance prejudiced the case. *Id.* This requires showing that counsel's errors were so serious as to deprive the party of a fair trial—a trial whose result is reliable. *Id.* In other words, a parent must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the parent's case. *In re M.S.*, 115 S.W.3d at 545.

To determine whether representation was deficient, we must consider all of the circumstances surrounding the case and determine whether counsel was "reasonably effective." *Id.* In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466

U.S. at 689). Only if counsel's conduct is "so outrageous that no competent attorney would have engaged in it" will we find such performance deficient. *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *In re M.S.*, 115 S.W.3d at 550. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, the parent must also show that "counsel's deficient performance prejudiced the defense." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *Strickland*, 466 U.S. at 687).

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions. *In re Z.M.R.*, 562 S.W.3d 783, 793–95 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (mem. op.). Father bears the burden of demonstrating a reasonable probability his parental rights would not have been

terminated if not for his trial counsel's conduct. *See In re V.V.*, 349 S.W.3d at 559–60.

## B. Analysis

Father argues that the following acts by his trial counsel constituted ineffective assistance: (1) Counsel failed to seek disqualification of counsel for Intervenors; (2) Counsel failed to admit any relevant evidence on behalf of Appellant, save and accept the testimony of one witness, and even in that counsel failed to flush out the relevant testimony of that witness, and all exhibits offered by counsel were deemed illegible; (3) Counsel failed to object to harmful evidence at trial; (4) Counsel failed to move for a continuance based on pending charges; (5) Counsel instructed her client not to speak with the Department or CASA, and additionally instructed CASA and the Department not to speak to her client. Counsel then failed to ensure the information necessary to protect Appellant's parental rights was communicated; (6) Counsel failed to ensure that Appellant received, reviewed, and understood the family service plan ordered by the Court; (7) Counsel failed to object to discovery; (8) Counsel failed to file a motion to change placement following the completion of ICPC's on the children's grandparents; (9) Counsel failed to have her client appear at trial by telephone; and (10) Counsel "Agreed as to Form" the Order of Termination, which based the termination of parental rights on grounds of 162.001(b)(1)(D), (O), (N), and (P),

which had not been orally ruled on at trial. At trial, termination was granted only on 161.001(b)(1)(D) and (O).

"We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for [her] actions." *In re F.L.H. IV*, No. 04-17-00425-CV, 2017 WL 6597829, at *15 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.) (quoting *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). Our record does not show the basis for counsel's decisions to take and not take the complained-of actions. Because the record is silent as to the reasons for counsel's conduct, we may not speculate to find counsel's performance deficient. *See Walker*, 312 S.W.3d at 623 ("We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions."). Without evidence about strategic reasons for counsel's behavior, Father fails to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See In re M.S.*, 115 S.W.3d at 545; *see also Strickland*, 466 U.S. at 689.

Even if Father had met *Strickland's* first prong, he has failed to show that, but for counsel's alleged errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Other than stating, "Both prongs of the *Strickland* test are shown by counsel's numerous deficiencies before and during

36

trial" and "Counsel's performance was wholly inadequate, her performance was deficient, and that [] deficiency prejudiced [Father's] case[,]" Father has not explained how, but for counsel's allegedly deficient conduct, the result of the proceeding would have been different. We have already concluded that the evidence is legally and factually sufficient to support the endangerment finding under subsection (D) by clear and convincing evidence. We have additionally held that the evidence is legally and factually sufficient to support the best-interest finding against Father. Father offers no explanation of how the trial court's judgment terminating his parental rights—the controlling issue in this case—would have changed had trial counsel performed differently.

We overrule Father's first issue.

## Conclusion

Having overruled all of Father's issues, we affirm the trial court's Order of Termination.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Kelly and Rivas-Molloy.